IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 25-CR-3143-MDH |
| | ) | |
| JUANITA FAYE HOLTSCHNEIDER, | ) | |
| | ) | |
| Defendant. | ) | |

SENTENCING
BEFORE THE HONORABLE M. DOUGLAS HARPOOL
TUESDAY, MAY 12, 2026; 10:00 A.M.
SPRINGFIELD, MISSOURI

APPEARANCES:

FOR THE PLAINTIFF: MR. PATRICK CARNEY
UNITED STATES ATTORNEY'S OFFICE
901 St. Louis, Ste. 500
Springfield, MO 65806

FOR THE DEFENDANT: MR. SCOTT B. PIERSON
TWIBELL PIERSON CRIMINAL LAW
901 St. Louis, Ste. 1600
Springfield, MO 65806

COURT REPORTER: MS. JEANNINE RANKIN, RPR,CSR,CCR
UNITED STATES DISTRICT COURT
222 N. Hammons Parkway
Springfield, MO 65806

Proceedings recorded by mechanical stenography; transcript produced by computer.

USA v JUANITA FAYE HOLTSCHNEIDER

CASE NO. 25-CR-3143-MDH

SENTENCING

May 12, 2026

* * * * * *

THE COURT: We're here to take up and consider the sentencing for Juanita Faye Holtschneider. Who appears on behalf the United States?

MR. CARNEY: May it please the Court, Your Honor. The United States appears by and through Patrick Carney.

THE COURT: And on behalf of the defendant?

MR. PIERSON: May it please the Court, Your Honor. Scott Pierson for Ms. Holtschneider.

THE COURT: Ms. Holtschneider, if you'd stand.

My name is Doug Harpool. I'm the federal district judge that has responsibility for your case. That means that I have presided over your case, but this morning that imposes on me the duty to sentence you. The law requires me to sentence you to a sentence which is sufficient but not greater than necessary to meet the objectives of the U.S. sentencing laws.

So we'll proceed in three steps. First, the lawyers and I will make sure we agree on what crime you committed and what the Congress has authorized for a range of punishment for that crime. We then will talk about the factors that the

Congress has said that a Court should consider in determining where within the authorized range your sentence should fall. Those are at the law at Title 18, Section 3553(a). We're going to consider every one of those factors and each of the lawyers have already briefed those factors with me.

One of the factors that we are required to consider by that section is the U.S. Sentencing Guideline put out by the U.S. Sentencing Commission, and so we will take a moment and discuss the guideline and where your sentence would fall according to those guidelines. The lawyers will make their presentations on those factors, supplementing their brief as they think is appropriate.

When they're finished, a third step will be you will be given a chance to say something to the Court, if you'd like to. It's not mandatory. You don't have to say anything. But if there's something you want to say, you're going to get a chance to say it. It is after that third step that I'll make a final decision on what your sentence should be and I'll do my best to explain to you how I came to that conclusion.

You understand how we're going to proceed?

THE DEFENDANT: Yes, sir.

THE COURT: Now, I read everything submitted to me. One of the things I've read is your presentence investigation report. Have you read that report?

THE DEFENDANT: Yes, sir.

THE COURT: If you'll be seated, then, we'll get started.

The crime that you've committed is described -- two counts. First is wire fraud. Under the law a person convicted of wire fraud can be sentenced to not more than 20 years in prison, fined up to $250,000, then would have a period of supervised release following their release and a $100 special assessment.

Count 2 is a failure to pay employment taxes. That's a Class D felony. It brings with it a sentence of not more than five years in prison, not more than a $10,000 fine, not more than three years of supervised release, and payment of a $100 special assessment. There is also a forfeiture allegation that is part of the indictment.

Do the counsel agree that's the crimes of conviction and the range of punishment that's applicable?

MR. CARNEY: The government concurs, Your Honor.

MR. PIERSON: Yes, Your Honor.

THE COURT: All right. So now the question becomes where within that authorized range, the 20 years in the first count and the five years in the second count, is an appropriate sentence for you. That's where we consider the factors of 3553(a) of Title 18. As I told you, one of the factors that we are to consider is the sentencing guideline put out by the U.S. Sentencing Commission. The presentence

investigation report calculates the offense level at 20 and your criminal history category at one.

Are there objections to either of those calculations which I need to take up or consider?

MR. CARNEY: None from the United States. Thank you.

MR. PIERSON: None, Your Honor, just argument.

THE COURT: All right. Well, now, the way this works on calculating the guideline is you have a calculated offense level, and the high is 43 and yours is considered to be a 20. And then you calculate your offense level -- your criminal history category and it goes up to six levels, but your level is one, which is the lowest. So we look at six columns in the back of the sentencing book at offense level 20, the first column, and it will tell us that the U.S. Sentencing Commission suggests that you be sentenced to between 33 and 41 months in prison.

At one time the law required your sentence to be within that range. That is no longer the law. Now we merely consider that as one of the factors to consider in sentencing.

So I'll recognize Mr. Carney on behalf of the government first to make whatever presentation he wishes on behalf of the -- considering the 3553(a) factors.

MR. CARNEY: Thank you, Your Honor. If it please the Court?

THE COURT: Proceed.

MR. CARNEY: Thank you.

Your Honor, first, to begin with, normally I come to you with a full bevy of arguments because I've had the opportunity to review the sentencing memorandum. I understand that defense counsel was ill in the hospital. That's what he just told me a few moments ago. I certainly appreciate that circumstance, but I did not receive the sentencing memo until 8:00 this morning and have not had a chance to go over it in detail.

THE COURT: That's the same time the Court got it but we did get an opportunity to review it so --

MR. CARNEY: Thank you.

Your Honor, with regards to this particular defendant, the government -- and I know that the Court has reviewed the government's sentencing memorandum, but we are requesting a sentence of 41 months. That is at the high end of the guideline range. We are also asking for full restitution.

And I bring up kind of a side issue with regards to restitution because the parties have negotiated a restitution amount of $283,878, which is consistent with what's in the PSR. I was informed recently -- and I've told defense counsel -- that there is a -- there's an interest accruing that comes on these types of tax cases and I was told that

that additional interest would be an additional $32,491. I simply wanted to let the Court know of that because should -- depending on the Court's ruling, that could materially affect the victim in this case because that interest does need to be paid.

You look like you wish--

THE COURT: Well, I was going to ask you a question. Obviously the IRS is a victim, but also is the employer?

MR. CARNEY: Yes.

THE COURT: Does the interest accrue strictly on the tax part or does it also accrue on the part involving the employer?

MR. CARNEY: Only on the tax part, Your Honor, not on the employer.

THE COURT: All right. Proceed.

MR. CARNEY: Well, Your Honor, in this particular case I do wish to address one or two points. I was able to quickly glance over the defendant's sentencing memorandum.

First, Your Honor, is that I note that the defendant is requesting what can only be colored as a massive downward variance. We're talking about a sentencing range of 33 to 41 months. They are asking for five years of probation for an individual who stole well over a quarter million dollars. Not only from the folks at G2, not only from the American taxpayers, but also specifically from the individual employees

at G2, because I don't think it should be lost the nuanced fact in this that the money that this defendant took that was supposed to be paid was taken out of the paychecks of individual employees at G2 and should have been paid over.

This wasn't a situation where this defendant simply gave the money back or didn't take the money and didn't submit it to the federal government. It was a situation where she took effectively money out -- that came out of their checks that was supposed to go to the federal government for employment taxes and then proceeded to utilize it for personal expenses not limited to but including quite a few gambling expenses. So that's the first thing that I wanted to raise with the Court.

Secondly, defendant makes the point that deterrence would be served with a felony conviction in this case. I would point out, Your Honor, based upon the PSR that such an argument seems to have been undercut by the defendant's own criminal history. While her criminal history is old, she only has a criminal history score of one, she does have a criminal history that involves not only stealing but also possession of a controlled substance. They do go back some period of time. Well, the possession of controlled substance is only a few years old but the stealing charge out of 1995 was a felony and it certainly didn't deter this defendant from committing even a more massive fraud in this particular case.

In addition to that, the defense takes aim at the two-point enhancements for specialized knowledge and trust as well as sophisticated scheme. They seem to argue that those should not be applied and that if they weren't applied, her sentencing guidelines would be in fact lower. Of course, the government would concur that they would be lower if they weren't applied.

In this particular case this defendant was in a position of trust, serving as either the accountant or bookkeeper for G2. She was given that position of trust. She was paid for that position of trust. There is no denying that. And plenty of thefts can occur, plenty of embezzlements can occur without being in a position of trust. So their challenge to that or -- to that particular enhancement we would contest greatly.

In addition to that, the sophisticated scheme -- and I know the Court has seen plenty of these types of cases, this defendant actually created paperwork that directly misled the folks at G2. In fact, G2 did not know that this embezzlement was going on until it was actually raised by the IRS.

So I would argue that this defendant's ability to conceal this fraud scheme was in fact sophisticated enough to actually elude the folks at G2 and raises itself to a substantial level, not just kind of a tertiary level in which, you know, they're just practically trying to -- or that G2 was

practically ignoring what she was doing. They were not.

So those are the points of defense that I wish to bring up and I wish to challenge.

In this case, Your Honor, though, the defendant engaged in a fraud scheme that involved over 100 different fraudulent transactions. I believe the count was 102. This defendant was placed in a position. She knew her position of trust within the company to pay employment taxes. It wasn't until the IRS actually notified G2 -- the underlying victim in this case -- that taxes were not being paid over and they were actually in the process of placing lien holds and beginning administrative action against the victim company for the failure to pay over these employment taxes.

I know that when I'm in front of Your Honor many of these cases go two or three or four years. This was basically a year, maybe a little less, maybe a little bit more. This defendant stole over a quarter million dollars. And that kind of brings me to my second point.

This was not done to put food on the table. This was not done to keep roofs overhead. This was done -- as we illustrated within our sentencing memorandum -- to pay for gambling, to pay for personal expenses. I believe there was also an expense dealing with the defendant's son, some sort of fees related to an organization. These were not things that the defendant absolutely had to have taken care of. These

were things that she chose to steal over a quarter million dollars within a year to simply pay for because she was upset, that she felt she was not being paid enough by the underlying company.

If that is the circumstance, if that is the threshold by which we judge individuals allowable to steal money, well, then I believe almost every business in this country is going to be put out of business because I don't know anybody who isn't unsatisfied with their pay. I'm unsatisfied with my pay. I would love to receive more. But I don't. And I certainly don't devolve my position to embezzling funds simply to address that.

Your Honor, with regards to what this defendant's done, we are talking about 280-plus thousand dollars. I can't imagine a situation -- and I know the Court has brought this up -- that even if somebody steals $50,000, we would be talking about a probationary sentence. This is not an insignificant sum of money.

While I know the defense is going to tell you that they have the money coming because of a personal injury suit, that doesn't deflect the fact that just because she may be -- she may come into a position where she can pay restitution back that she has done no harm. She has done very real harm, not only to the company of G2, placing them in the position that they did with the IRS, taking from the employees of that

company, also embezzling directly from G2, but also stealing from the American taxpayer.

Those monies not only go to crucial programs such as Social Security and various social welfare programs but they serve as the life blood to the foundation of this institution, of this republic. This was an attack on all of that. When one person engages in this kind of conduct, this type of evasion, this type of tax fraud as well as embezzlement, it's an attack on us all.

So with regards to a sentencing recommendation, despite the fact that the defendant only has a criminal history score of one -- and she benefits from having that criminal history score of one which dramatically lowered her sentencing guideline range -- we believe that a high-end guideline sentence of 41 months is absolutely reasonable under the circumstances given the sophisticated scheme that she employed and given the unique measures she employed in order to take this money.

It's not a small point to remember that the victim in this case had control over their own bank accounts. What she did was she utilized the QuickBooks system that she had control over within the company to effectively end run their security measures and hence conceal her activities even more, then causing monies to be directly deposited into her accounts despite the fact that she wasn't allowed to do that.

All of these factors are -- I raise them because I believe that they are specifically unique to this case and they were different from what's been presented before the Court in previous embezzlement cases in which this Court has sentenced individuals to prison.

So with that, Your Honor, the government would stand by its recommendation and request a sentence of 41 months' imprisonment.

Thank you, Your Honor.

THE COURT: The monies that were taken, are these the income tax withholdings or Social Security, FICA, or a little bit of both?

MR. CARNEY: It's the FICA taxes, Your Honor.

THE COURT: It was the FICA taxes?

MR. CARNEY: Yes. It's the ones that go into basically a total accumulation of matching with regards to the employment taxes.

THE COURT: All right. And how does that -- you're going to have to educate me a little bit. How does that impact the employer? How did that touch upon the employer's contribution?

MR. CARNEY: With regards to -- in speaking with my agent, Your Honor, the employer's portion was in fact also taken. So it's -- we're talking about everything here. It was -- all money that was supposed to have been paid over,

none of it was paid over.

THE COURT: All right. I got it. So that's the portion of the FICA that the employer would contribute, she took that, too?

MR. CARNEY: Yes, as well as what the employees would have normally contributed.

THE COURT: All right. Is the employer still on the hook for that amount of money?

MR. CARNEY: Not with this restitution order, no, Your Honor. It would not be on the hook for this amount of money.

THE COURT: All right. Thank you.

MR. CARNEY: Thank you.

THE COURT: Mr. Pierson, on behalf the defendant.

MR. PIERSON: May it please the Court?

THE COURT: Proceed.

MR. PIERSON: Your Honor, I do start by just talking a little bit about the tax emphasis on this and also talking about the short-term, long-term and then ultimately the want to make restitution in this, which I do think is important. Then I want to speak a little bit about Juanita in general and ultimately I think a person that if you look at a few years ago you would not plan on being in a federal courthouse looking at going to the Federal Bureau of Prisons.

First, in regards to the employment tax issue here.

This was a situation where the employment tax specifically was being funneled into accounts using QuickBooks by Juanita. So I do think that's an important consideration. I also want to note that insurance did step in at some point in time and make the situation whole. Ultimately I believe that the insuror in this circumstance is going to be reimbursed, and I will talk a little bit about that.

Since this incident took place she was involved in a motor vehicle accident. That motor vehicle accident has settled. It is in trust at the law office of Brad Bradshaw. It's a $400,000 settlement. At this point in time they are going ahead and rectifying any type of medical liens that might have existed on the account. She has a amount that's supposed to come back to her, roughly the amount of $300,000. After liens we suspect that would be roughly $250,000. She has earmarked all that money to go towards restitution in this case. I do think that's an important consideration for the Court. She wants to make this whole.

And you might say, Well, it's very easy to say today that she wants to make that whole. I will note that as soon as she received a letter from the IRS, we reported, both of us, to the IRS office not once but twice and spoke with them in great detail. She -- actually, I think she was commended by the IRS agents for making the investigation easier in this matter. She fully divulged everything that she did. She

fully divulged the practices, the way she was doing it. She helped them understand the accounts that were taking place. She did that upon two meetings. She took full responsibility.

Yes, she did pick some claims about ultimately her reasoning for doing this and I want to speak a little bit to that and just about Juanita at this point in time.

Ultimately, I agree with the U.S. Attorney in this situation. It is very rare that I stand in front of a Court and I ask for probation in a case like this. I would traditionally not do so. It is a great deviation from what I traditionally recommend. I might ask for a lower-end guidelines.

There is -- I want to speak a little bit about how she -- prior to this incident we had -- 1995 we had a stealing offense. Look at her criminal history. I would ask the Court to take a look at the PSI and the situation and you'll see on there where we see the criminal history that took place and there was the 1995 criminal history. Outside of that we had a possession of controlled substance here last year. But that stealing offense -- which was the four-year probationary offense out of 1995 -- we've had -- she was 28 years of age and spent 30, 40 years -- excuse me, 30-plus years before you have any other type of conduct taking place.

Since then she began a family. She has her daughter here today with her. She's been taking care of grandchildren.

She's been taking care of her mother. She had had a husband that she was growing a family with. That all changed in 2020.

This was a -- you'll notice the criminal history. We go from 1995 from the date of the arrest to essentially a speeding ticket in 2019 and then we have this possession of controlled substance in '23.

I do think it's important to indicate why all of a sudden somebody late in age begins to get a criminal history, because you have this individual who for 30 years has gone without so much as just a speeding ticket later on in that situation and that's the extent of it and all of a sudden now we're here in federal court.

In 2020, which is indicated in the PSI, there was an assault that took place. That assault ended up leading to her divorce. She was in a position where she had to take care of herself, take care of her family and become essentially the sole breadwinner under that circumstance. That all required her to have multiple jobs and wear multiple hats.

You're right, if everybody who -- the U.S. Attorney, Mr. Carney, is exactly correct that if everybody who said there's an issue with regards to their pay went back and they argued or they stole, that no business would be there. That's correct. She went the wrong method.

She had been working overtime. She had been trying to supplement anything she could in order to get this done.

She felt that she wasn't getting reimbursed for that overtime. That is a very common thing in our country, wage theft. In that regards, is one of the biggest issues, economic issues, economic disparity in our country. And she should have done different things to report that. Instead, she began funneling money at that point in time and it got out of control and it ultimately led to this.

At that time she developed -- in coping with the divorce, sexual assault and being out on her own, taking care of her mother who passed away November of last year, she used gambling and she used methamphetamine as a coping mechanism in both those situations. She used methamphetamine in that circumstance in order to help allow her to work late hours. And then she also took the money to provide for education for her kids, provide for fees for her kids, also providing some vacations with her children and then ultimately also to gamble.

And people who have trauma -- I think that goes without saying -- cope with that trauma in different ways. I'm not saying that it's an excuse but it is absolutely the reason why we're here in front of this Court today. But for that trauma, but for that situation, I don't believe that you see Juanita here.

And you begin to read these letters of recommendation that I provided to the Court and you read the

PSI, this is an individual who even though she hasn't had significant means throughout her life has always given back to the community. She's been somebody who's given back in Webster County, somebody who's given back in the Marshfield area by doing things for children, by doing things for people in need, because that's just who she is. She's a giver in that regards.

Since this incident she's been on pretrial release and she's had -- and correct me if I'm wrong, but she's had no issues on pretrial release, Your Honor. That's the expectation, that's the standard, but it also indicates an individual who is willing to abide by and follow Court orders and is doing anything necessary to make sure that they want to put people back in a good position.

Ultimately she wants to make restitution in this case. She wants to make the United States government whole. She wants to make her former employer whole in this situation as well.

What I'm asking for the Court today is for -- is for probation and for five years, anything else the Court needs just and necessary that would be applicable.

I do want to talk a little bit about the points and I want to clarify my argument. I'm not saying that all four of those points by their very nature should not be accumulated. I think that -- and I didn't object to those

points. I'm saying by their very nature the fact that she received a two-point enhancement for specialized scheme and also a two-point enhancement for trust when she was an accountant, it would be -- because she was using QuickBooks as the accountant seems duplicative to me.

The fact that she was an accountant and she was using QuickBooks seems to go hand in hand, which I would say the 18-point -- 18 points instead of 20 points might be a direction that we're looking at this. That would have been 26 months to 33 months instead of the guidelines of 33 to 41 months and then ultimately the high end of the guidelines.

There's a couple things I do definitely know, though, however in this case regarding Juanita. She's not somebody who is I think deserving of the high end of the guidelines in this situation. The recommendation of the maximum guidelines here of 41 months I don't think is appropriate. I don't think it underscores, one, her -- the fact that she has been overly cooperative with the federal government and she's been remorseful since day one in regards to this. It also doesn't take into consideration her current health conditions, which are well documented within both the PSI and also in our sentencing memorandum, and ultimately she has continued care that she needs to receive from Mercy that she is receiving.

She's been going to counseling, which is -- I wish

that everybody when they had a traumatic situation would just go into counseling first. I wish that was the thing that they would do. But in this situation she didn't do that. But through this process she has started going through counseling. That's been part also of her pretrial release. That's been very positive for her. It's helped her navigate the death of her mother who she was the primary caregiver of who passed away late in 2025.

Ultimately I think that a probation order in this case does do a couple things. One, it does indicate to everybody that she will be a convicted felon and that she'll have that on her record for the rest of her life. Two, it does set a deterrent that if you are going to receive probation, we want a strict order to have an individual pay back restitution, which she's in a position uniquely at this point in time to pay back restitution because of her personal injury settlement.

That's not a situation, once again, where the money isn't going to be coming. I have spoken with the U.S. Attorney indicating that we'll have a check as soon as we can on that. Three months is more than enough time, if that was what the Court ordered today, then we would have that check.

And then we'd have the remaining balance. We would probably have a remaining balance of roughly $30,000, depending on what the Court does with regards to the

aforementioned interest that was brought up today.

While the money here is grave and the conduct was no doubt criminal, Your Honor, the -- I do think the fact that it was a short period of time and a relatively clean last 30 years is an important indicator here. The facts that we presented today for the most part are uncontroverted about what's taken place with Juanita. Ultimately, we are asking for the Court to depart from the guidelines and give Juanita probation.

Thank you.

THE COURT: Do you -- where are you on the numbers in terms of the restitution?

MR. PIERSON: Your Honor, I had gone off the restitution amount that was originally in the PSI, which is the 280,000 roughly. I don't want to mislead the Court and say that I believe that we're going to have that full amount. I believe we'll have $250,000 of that, Your Honor, and the amount that's also in the plea agreement. So that would be $251,000 to the IRS and then an additional $32,491 to G2 business account.

Once again, I'm not sure -- I know there's been insurance that has cured most of those damages, so I'm sure that would probably be paid back to the insuror at that point, Your Honor.

THE COURT: I want to ask you about the insurance.

MR. PIERSON: Yes.

THE COURT: It's not unusual for us to have a restitution request from the insurance company rather than the employer.

MR. PIERSON: Correct.

THE COURT: So you think the employer is going to be reimbursed by the insurance company?

MR. PIERSON: I do believe so, Your Honor. We received a letter to that, Your Honor.

THE COURT: Mr. Carney, are you concerned? Do you think the employer then will be required by law to repay it to the insuror?

MR. CARNEY: Your Honor, we've spoken with the victim in this case. To our knowledge no such insurance notification has been issued to us. In fact, I've had many cases in which an insuring company has come in and they're the first ones that announce what --

THE COURT: We order sometimes restitution directly to the insurance company.

MR. CARNEY: My victim assistance unit in my office has never been notified as to insurance. In fact, that was one of the issues I wanted to raise with the Court. This is the first time I'm hearing anything about any third-party insuror.

THE COURT: The issue would be -- well, I wouldn't

want the defendant to be ordered to pay restitution and then find out that the employer has been made whole by insurance.

MR. CARNEY: But even --

THE COURT: The insurance company would then go after her for the money again.

MR. CARNEY: Your Honor, I believe that 32-plus thousand dollars could be awarded to either G2 or to an insurance company should information be presented to the U.S. Attorney's Office.

THE COURT: All right. I just wanted to make sure we closed that issue.

MR. PIERSON: Thank you, Your Honor.

THE COURT: Is your client currently employed?

MR. PIERSON: Your Honor, she's still in a medical career. It's been limited, though, because of her personal injury, I do know that.

THE COURT: Right.

The presentence investigation report talks about a credit check with 48 active credit accounts, 24 of them have balances and then there are collection accounts?

MR. PIERSON: Yes, Your Honor.

THE COURT: Take that information as accurate?

MR. PIERSON: I do believe so, Your Honor.

THE COURT: Does your client wish to say anything to the Court?

MR. PIERSON: She does, Your Honor.

THE COURT: She may do so at this time.

THE DEFENDANT: I want to apologize to the Court for having to -- for causing the issues that caused -- that brought us here today. I want to apologize to my family. This has been really rough on all of us and I am sorry. I take full responsibility for my actions and I'm sorry that we're having to be here today.

THE COURT: Anybody have anything they want to add?

MR. CARNEY: Just one or two matters, Your Honor.

I wish to address the issue with regards to the use of QuickBooks that defense raised. I want to make it absolutely clear for the record: The defendant's use of QuickBooks was not taken into consideration as an enhancement purpose. Her position as a bookkeeper and accountant was the position of trust. Her then creation of false documents that directly misled G2 was the sophisticated aspect of the scheme. This use of QuickBooks is not a compilation of enhancement factors that were brought against the defendant outside the normal scheme, Your Honor. So I do wish to bring that up.

In addition to that, the defense has talked about the defendant's cooperation. She did offer up at first that she was willing to cooperate and in response the government agreed not to bring a ton of additional counts. In addition to the two counts that were brought we could have also brought

money laundering charges as well as tax evasion charges. None of these taxes that were stolen by the defendant were actually reported on her own personal income taxes.

So, yes, we are asking for the high end of the guideline range but this defendant has received a considerable benefit in not only the sheer number of charges that weren't brought but also the quantity or the types of charges that could have been brought.

THE COURT: I want to make sure our record is clear. There is no formal objection to those enhancements, correct?

MR. PIERSON: No, there's no --

THE COURT: You were simply asking for a variance because you thought maybe they resulted in a --

MR. PIERSON: It's just duplicative, Your Honor. There's no formal objection.

THE COURT: All right.

Ma'am, would you stand again.

Let me start with this: You've committed crimes that could have ended you in jail for over 20 years; 20 years on one count, five years on another. Stealing the amount of money you stole -- and it's theft. It might have been clever the way you did it, you didn't rob or burglarize somebody, but you stole -- in a short period of time can't be tolerated. And while it may feel like the victim is a person-less, big entity called the United States, that United States is part of

all of us.

THE DEFENDANT: Yes.

THE COURT: So when you steal from the United States, you steal from every one of us. And when that money would have gone into a Social Security fund that we all know it's financially challenged, but it's -- it's not just the trust of the -- we fellow citizens have to have trust in one another that we're all going to do our part to make this country work. And when you take your employees' paychecks, your fellow employees' paychecks and gamble them away or drug them away or whatever you did, it's an incredible breach of trust not just from our country and your fellow citizens but from those people that work hard every day.

THE DEFENDANT: Yes.

THE COURT: If anybody is entitled to that money if it's not the government on FICA taxes, it's them. They're the ones that worked it. You were concerned about you being underpaid, well, you just took money they could have had if it wasn't going to go to FICA taxes.

I have said this often and I believe this to be, that that's a huge breach of trust. And I think it threatens our country. The very stability of our country is a reliance on people paying their taxes when they're due and contributing as citizens to make this country work. When one citizen steals the contributions of others, it's a very serious crime.

I'm frankly not sure what a person does with that kind of money in that short period of time because you certainly don't have any of it left over. It looks like you actually have a lot of debts in addition to that. My guess is you gambled it away or drugged it away. I notice the one arrest you had --

THE DEFENDANT: Yes, sir.

THE COURT: -- for meth use when you're 55 was at Downstream Casino. Or at least they found your wallet there. You denied you knew what was in your wallet when they confronted you there.

You gambling away the money of your co-workers while you're high on meth is inexcusable. Yes, you may have had terrible marital issues, you may have had even health issues, but we don't respond by stealing other people's property or by gambling and meth. That doesn't solve anybody's problems. In your case it greatly exacerbated them.

I have also said this before: I frankly think the guidelines are too low for theft convictions like this because I think the threat to our society and the government, to our stable society is greater when we steal in this way than even some other crimes that affect one person here or another person there because this affects all of us. But so far the sentencing commission hasn't reacted to my opinion.

It's my judgment that probation is inappropriate for

you so I'm going to sentence you to the custody of the Bureau of Prisons for 31 months -- 33 months, excuse me, the bottom of the guideline. Thirty-three months on Counts 1 and 2 of the information, and they will run concurrently. I'm going to the bottom of the guidelines because I think the guidelines are too low generally but I do recognize your cooperation and I do recognize your health issues.

Upon release from imprisonment you'll be placed on supervised release for two years on Counts 1 and 2. While you're on supervised release you'll comply with the mandatory and standard conditions adopted by the Court. You'll also comply with the special conditions listed in Part D of the presentence investigation report.

I'm not going to impose a fine. You obviously don't have money to pay a fine. There is a mandatory $100 assessment for each felony count for a total of $200.

I am going to impose restitution. A lump sum payment of the full amount of restitution is going to be due immediately, understanding you're unlikely to be able to make all that payment even with your settlement. You'll make payments of at least 10 percent of your earnings while incarcerated or monthly payments of $200 or 10 percent of your gross income, whichever is greater. The government is going to be allowed to enforce restitution at any time, however.

I want the lawyers to listen carefully and make sure

I get the numbers right here.

The restitution will be paid to G2 Material Handling in the amount of $32,491 and to the IRS in the amount of $251,386.

MR. PIERSON: That's correct, Your Honor.

THE COURT: Now, does that include the interest or not?

MR. CARNEY: That does not include the interest, Your Honor.

THE COURT: All right. Interest will incur on the IRS portion of the restitution according to law.

The government, I already said, may enforce restitution at any time. You'll be subject to default and delinquent penalties.

If you change your name, residence or mailing address or if there's a material change in your economic circumstances that affects your ability to pay, you must notify the Clerk of the Court, United States Attorney's Office, Financial Litigation Unit, within 30 days. That will include the settlement of your personal injury suit. That's a material change in your economic circumstances.

Your payments will be made to the Clerk of the Court, United States District Court in Kansas City.

The preliminary order of forfeiture is finalized and imposed.

Mr. Carney, will you prepare a restitution judgment setting forth the terms?

MR. CARNEY: I will be happy to.

THE COURT: Run it by Mr. Pierson, make sure it's consistent with what I said.

MR. CARNEY: Yes, Your Honor. But I do have a question.

THE COURT: Yeah.

MR. CARNEY: The Court indicated that the numbers -- and I have those marked down, but you also indicated that interest would also be assessed.

THE COURT: Yeah.

MR. CARNEY: We do have that number if the -- to today's date that would be assessed for the interest portion of the IRS. I can include that number now for the Court's record, if you choose?

THE COURT: Well, let's do this, tell me what you think that number is. I want to give Mr. Pierson a moment to verify before the actual judgment is entered, but go ahead.

MR. CARNEY: Yes, Your Honor.

The statutory interest to today's date would be $32,491 additional that would be owed to the IRS.

THE COURT: Will interest continue to accrue on the restitution judgment?

MR. CARNEY: Yes, Your Honor.

THE COURT: At what rate?

MR. CARNEY: I apologize. It will not continue after the sentencing date by this Court.

MR. PIERSON: I would like an opportunity to look at that number, Your Honor, and just look to see what funds have been allocated.

THE COURT: Right. It's my intent to order interest on the IRS portion, according to law, but I -- and that's the number I understand the government contends it will be, but when you draft the restitution judgment, run it by Mr. Pierson and give him a few days to calculate the number and see if there's a dispute involving that number. If there is and it can't be worked out, then we'll come back here and do it again. But if it's no dispute, then we'll enter it as --

MR. CARNEY: I'll be happy to do so. I'll also include the IRS in those email conversations so that if Mr. Pierson has specific questions, they would be able to address them as well.

THE COURT: That would be good.

You understand that, sir?

MR. PIERSON: Absolutely. Much appreciated, Your Honor.

THE COURT: All right.

You have a right to appeal the sentence I've imposed. If you want to appeal, you need to do so within 14

days. If you don't appeal within 14 days, you risk losing the right to raise an issue even if you have reserved somehow the right to raise an issue on appeal.

You've been out on bond.

Does the government have any objection to self-reporting?

MR. CARNEY: No, Your Honor. In fact, we were made aware that the defendant has a medical procedure coming up in about 60 days or so, so we were not opposed to her remaining out of custody until she's had the opportunity to go through that medical procedure.

THE COURT: All right. I do want to try to accommodate your medical care.

So, Mr. Pierson, is self-reporting on July 21 --

MR. PIERSON: Could we have August 1st, please, Your Honor? Would that be appropriate?

THE COURT: I'm sorry?

MR. PIERSON: Would August 1st be appropriate with the Court, Your Honor? I believe she's set for the 20th for her medical procedure, so just a few days for recovery.

THE COURT: Twentieth of what?

MR. PIERSON: July, Your Honor.

PROBATION OFFICER: Your Honor, August 1st is a Saturday. The BOP typically does not --

MR. PIERSON: July 31st, if that would be

appropriate.

THE COURT: That's quite a bit longer than we normally allow.

Mr. Carney, do you have any objection if we go to --

MR. CARNEY: No objections, Your Honor, no.

THE COURT: All right.

Your self-report date will be July 31st.

MR. PIERSON: Thank you, Your Honor.

THE COURT: Understand that by self-reporting it is your obligation to report to whatever prison the Bureau of Prisons decides you would serve your time in. May be the local prison, which would be easy for you, but the Bureau of Prisons makes that decision, I do not. If they tell you to report to a prison in California, it's your job to get there. You understand that?

THE DEFENDANT: Yes, sir.

MR. PIERSON: Your Honor, can we make a request for FMC Carswell, please? That's a federal medical camp in the Texas area.

THE COURT: We will recommend that the Bureau of Prisons give consideration to that facility.

MR. PIERSON: Would the Court also find it appropriate for RDAP or have her be screened for RDAP as well, Your Honor?

THE COURT: Yeah, that would be appropriate given

the meth. I don't know, does Carswell have RDAP?

MR. PIERSON: I believe they do, Your Honor.

THE COURT: All right. We'll at least ask the Bureau of Prisons to evaluate her for participation in the RDAP program.

MR. PIERSON: Thank you, Your Honor.

THE COURT: I will tell you that her sentence is on the border of whether it's long enough. If not, we'll see what they can do for her.

MR. PIERSON: Thank you, Judge. Appreciate that.

THE COURT: Anything further, Mr. Carney?

MR. CARNEY: I apologize, Your Honor. Was the defendant's appellate rights --

THE COURT: I did.

MR. CARNEY: I misheard.

THE COURT: Anything further on probation?

PROBATION OFFICER: I may also have missed it, the forfeiture -- preliminary order of forfeiture?

THE COURT: It's final. I thought I said that.

MR. CARNEY: You did, Your Honor.

THE COURT: Good luck to you, ma'am.

We'll be in recess.

(Court stands in recess at 10:45 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jeannine M. Rankin, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, Southern Division, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings.

*/s/ Jeannine M. Rankin*

Date: 06/10/2026 Jeannine M. Rankin, CCR, CSR, RPR